ISAAC FOOTE Junior, Appellant, &c.
ROBERT WORTHINGTON, Appellant, &c.

A testator gives to his wife a house and lot of land ; also " the whole of my stock in the Housatonic bank, amounting to $ 6000, and in case I should sell or dispose of the bank stock aforesaid, I give to her $ 6000 in cash, provided, &c." also a farm; " to have and to hold the same to her, viz. the first described house and lot of land, together with the bank stock or $ 6000 in cash, in her own right forever, provided, &c. otherwise it is to go to my heirs at law ; and the farm, during her natural life; as to the rest of my estate, I give [the same] to the use of my wife during her natural life, and after her decease, to my heirs at law forever." At the time of making the will the testator owned sixty shares of the bank stock, amounting to $ 6000, and at the time of his decease, ninety-six shares. It was *held*, that the bequest of the stock was a specific legacy of the sixty shares.

Where a testator gave to his wife the use, during her life, of certain estate, consisting of land, promissory notes and bank shares, it was *held*, that upon the death of the wife her executor was entitled to the rent of the land and the interest on the notes, up to the time of her decease, though payable subsequently, but to no part of a dividend declared, after her decease, on the bank shares, inasmuch as it was incapable of being apportioned.

THE last will of Caleb Hyde, dated the 1st of November, 1826, contained the following provisions : — I give and devise to my beloved wife, Rhoda Hyde, the house and lot of land, &c. I also give and bequeath to my wife, Rhoda Hyde, the whole of my stock in the Housatonic bank, at Stockbridge, amounting to six thousand dollars ; and in case I should sell or

dispose of the bank stock aforesaid, I give and bequeath to her, the said Rhoda Hyde, six thousand dollars in cash, which I order shall be paid to her within six months after my decease, in her own right, provided she makes a will before her decease ; otherwise I give and bequeath the same to my heirs at law. Also the farm, &c. To have and to hold the same to her, the said Rhoda, viz. the first described house and lot of land, together with the bank stock, or six thousand dollars in cash, in her own right, forever, provided she makes a will, and devises the same before her decease ; otherwise it is to go to my heirs at law ; and the last described lot, &c. during her natural life, and after her decease I give and bequeath the same to my heirs at law. As to the rest and residue of my estate, real, personal or mixed, in possession, reversion or remainder, after my just debts are paid from the same, I give [the same] to the use of my wife, Rhoda Hyde, during her natural life, and after her decease, to my heirs at law." The wife is then named sole executrix.

The testator died in March, 1838. The wife died on the 4th of January, 1839, having partly settled her husband's estate as executrix. Upon her death Isaac Foote junior was appointed administrator *de bonis non, cum testamento annexo*, of Caleb Hyde. Rhoda Hyde made a will, and appointed Robert Worthington her executor.

Subsequently to the making of his will Caleb Hyde purchased thirty-six shares in the Housatonic bank, so that at the time of his decease he owned ninety-six shares, on which a dividend of profits for six months, declared on the 1st of April, 1839, was received by Foote. In October, 1838, the widow leased the real estate from that time till April, 1839, for $ 55, which was received by Foote. Interest also accrued before the death of the widow, which was afterwards received by Foote, on certain promissory notes belonging to the estate of the testator.

On the 7th of May, 1839, Foote, as administrator, rendered an account in the Probate Court, in which he charged himself with a balance of personal estate, amounting to $ 10,236·46, including the bank shares and these several items of income ; and thereupon the judge of probate decreed, that he should transfer and assign to Worthington, executor of the will of

Rhoda Hyde, sixty of the bank shares ; and should pay him $ 240, the dividend declared on sixty shares on the 1st of April, 1839 ; also $ 73, that portion of the dividend which accrued on thirty-six shares between October 1st, 1838, and the death of Rhoda ; and the further sum of $ 27·50, received for rent due before her death ; and that the administrator should retain the residue of such balance, viz. $ 3895·96, and account for the same thereafter.

Foote appealed from this decree, so far as it concerned the sums of $ 73 and $ 27·50, because, inasmuch as the same had not been collected or appropriated by Rhoda Hyde to her use, the judge ought to have decreed a payment thereof to the heirs at law of Caleb.

Worthington, as executor of Rhoda, appealed from the same decree, 1. because the administrator was ordered to assign to him only sixty of the bank shares, when by the will of Caleb, he was entitled to all the shares, viz. ninety-six, owned by Caleb at his decease. 2. Because it was ordered that the administrator pay to him a part only of the dividend of April, 1839, when by the will he was entitled to the whole dividend on the ninety-six shares.

*Briggs* and *Jones*, and *G. J. Tucker*, for Worthington.
*Byington*, for Foote.

Sept. 20th.

MORTON J. delivered the opinion of the Court. A controversy has arisen between the administrator *de bonis non* with the will annexed, representing the heirs at law, of the late Dr. Caleb Hyde, and the executor of the last will of Rhoda Hyde, his widow, in relation to the settlement of his estate under his will. Several questions have been brought before us by the respective appeals of the litigant parties. The first and most important one relates to the construction of a clause of Dr. Hyde's will. After devising to his wife a certain house and lot, he uses these words, " *I also give and bequeath to my wife R. H. the whole of my stock in the Housatonic bank at Stockbridge, amounting to six thousand dollars.*" At the execution of the will the testator owned *sixty shares*, but before his death he purchased *thirty-six more*. And the question now is, wheth-the *sixty* or the *ninety-six* shares, passed by this clause of the will.

Sept. 21st.

Was this a specific or a general legacy? There is no doubt the law favors general, rather than specific legacies, and that courts lean towards the former and against the latter. But neither the preference of the law, nor the leaning of courts, extends to cases where the intention of the testator can be satisfactorily ascertained. That is the polar star to which both look for a guide. The question what constitutes a specific legacy, and the difference between the several kinds of legacies, have often been discussed. The cases upon the subject are very numerous, and somewhat contradictory, run into nice and shadowy distinctions, and altogether form a complicated labyrinth which we have no need now to attempt to explore. The subject has been thoroughly and ably examined and the cases elaborately reviewed in this Court. And there is danger that a reëxamination of them would produce more confusion than light ; and instead of illustrating, would obscure the question before us. See *White, Judge,* v. *Winchester,* 6 Pick. 48, and the cases there cited.

Another undisputed general rule of law, refers the operation of a bequest of personal property to the state of it at the death of the testator, and not at the date of the will. In relation to real estate the rule (until modified by Revised Stat. *c.* 62, § 3,) was the reverse. Only that passed which was owned by the testator when he made his will. But chattels are so changeable and fluctuating, and the situation of them, at any particular period, so difficult of proof, that the law wisely applies the testamentary disposition of them, to their state when the property in them becomes fixed and certain by the death of the testator.

If therefore Dr. Hyde had bequeathed all his personal property, or all his stocks, generally, whatever he had at his decease would have passed by the will. The presumption would have been, that he so intended, and that when he increased them he knew how the new acquisitions would be disposed of by the will, and therefore that he intended they should be so disposed of. Is there any thing in the will to rebut this presumption, and to show an intention to give specifically the *sixty shares* which he then held ? We think there is.

It may, in the first place, be remarked, that the books make

a distinction between the shares in joint stock companies and other personal property. *Ashburner* v. *M' Guire*, 2 Bro. Ch. R. 108 ; *Jeffreys* v. *Jeffreys*, 3 Atk. 120 ; *Selwood* v. *Mildmay*, 3 Ves. 310. If the testator had bequeathed sixty shares in the Housatonic bank, the legacy would have been specific, and come precisely within the decision in *White, Judge,* v *Winchester.* And is not the language used, a circumlocutory mode of expressing the same intention ? In *Ashburner* v. *M' Guire*, the words were, " I bequeath to W. B. my capital stock of a thousand pounds, in the India Company's stock." In *Jeffreys* v. *Jeffreys* the testator gave " his daughters 2702*l.* 3*s.* capital stock in the Bank of England, and 2000*l.* capital stock in the English East India Company." In both cases the testators, at the date of their wills, were possessed of the exact amount of stocks mentioned, and both were held to be specific legacies. In questions of construction it is almost impossible to find two cases exactly alike in every respect. But we can see no essential difference between the two last cases and the present one. And were this to be determined by authority, we should feel safe in resting it upon the three cases above cited. But we think this stronger than either of them.

The testator immediately provides for the contingency of the transfer of the stock. In case of the sale of the stock, he bequeaths to his wife *six thousand dollars*, the exact value of the stock at the time, thereby identifying the subject of the bequest and showing that it was the value·of the stock he then held, and not what he might thereafter acquire, which he intended to give.

Again, the language here used is specific and refers definitely to the *sixty shares* which he then owned. The words are, " in case I should sell or dispose of the bank stock *aforesaid,* I give," &c. The word *aforesaid* necessarily refers to the stock he then had, and not to any which he might afterwards purchase.

Further, this construction is confirmed by a subsequent clause in the nature of an *habendum.* After devising to his wife another farm for life, the testator adds, " to have and to hold the same to her the said Rhoda, viz. the first described house and ot, together with *the* bank stock or six thousand dollars, in her

own right forever, &c. The bank stock can mean no other than the *sixty shares*, or *six thousand dollars* worth, then in his possession.

In view of all these circumstances we are of opinion, that the legacy was a specific one, and that the widow is entitled to the *sixty shares* and no more.

Three other questions have been raised upon the residuary claim in the will, by which the testator gave the *use* of all the residue of his estate to his wife during her life, and afterwards to his heirs at law. One relates to the income of the bank stock, another to the income of the money at interest, and the third to the rent of the real estate.

1. The widow, during her life, received all the dividends which were declared upon the bank stock. The last dividend which she collected was in October, 1838, and she died in January, 1839. The executor claims about one half of the dividend which was declared in the April following, alleging that a proportion of it accrued during her life. This claim cannot be sustained. The dividend is incapable of being apportioned. How much was earned before and how much after her death, what amount of bad or doubtful debts existed at one period and what at another, cannot be ascertained. Whether any dividend would be declared at the end of the next half year, the officers of the bank themselves could not know, at the time of her decease. If, in former dividends, the officers had trenched upon the capital, as sometimes has been done, still the legatee would have been entitled to all she had thus received, although it would have left the stock, for the heirs, of less than its par value. So if they had divided less than the actual acquisitions, the heirs would have had the benefit of the reserved fund, in the increased value of the stock, and she could have obtained no more than the dividends made. The acquisitions of banks and other similar corporations are mere incidents of the capital stock and undistinguishable and inseparable from it till set apart by the declaration of a dividend by authorized officers. They pass with the stock in all transfers of it. The regular income of bank stock consists of the dividends duly declared upon the shares, and this is all which can pass under a gift of " the use " of it. And we are of opinion,

that the executor of the widow was not entitled to any part of the dividend made after her decease. She had no claim upon the bank during her life, and whether she ever would have, was uncertain at the time of her death. The stock, with all the incidents attached to it, then vested in the heirs at law or their representatives.

2. But the claim for the interest of the money on loan rests upon a different basis. The interest accrued from day to day ; and might have been collected by the widow at any time during her life. But if it had been otherwise and the interest by contract had been payable annually, it would still have been due to her ; *debitum in presenti, solvendum in futuro.* The acquisition is uniform and certain, and capable of an exact apportionment, for any definite periods of time whether great or small. The executor of the widow was therefore entitled to all the interest which accrued up to the day of her death.

3. So the *use* of the real estate included the regular income of it as long as the legatee lived. Whatever rent therefore accrued during her life, whenever it might be payable, belonged to her, and must go into the hands of her executor.

*Decree reversed in part, and remitted for further proceedings in the Probate Court.*